## Commonwealth *versus* Jeandell.

1. The law gives to the public the right of enjoying the Sabbath as a day of rest and of religious exercises, free and clear of all disturbance from merely unnecessary and unallowed worldly enployment; and where the law is contravened in such a manner as to disturb that enjoyment, *by noise or disturbance accompanying it, or incident to it,* it is a breach of the peace.

2. The running of cars on passenger railroads on Sunday, by reason of the noise accompanying them, is a disturbance of the public peace of the Sabbath, and the rights of worship and of rest; and the drivers of such cars may be arrested, and held for a breach of the peace.

3. Driving a public conveyance, for hire, on Sunday, is a violation of the Act of Assembly, of 22d April, 1794, inflicting the penalty of four dollars for performing worldly employment on the "Lord's day, commonly called Sunday." *Commonwealth* v. *Johnson,* 10 Harris, 102.

THE prisoner, Wm. H. Jeandell, was brought before Justice

Thompson, of the Supreme Court, sitting at *Nisi Prius*, on a writ of *habeas corpus*.

The facts of the case are fully set forth in the following opinion delivered July 23, 1859, by

THOMPSON, J.—The prisoner, Jeandell, was arrested on Sunday, the 17th inst., by officer Sergeant Orr, on instructions from the Mayor, while in the act of driving one of the cars of the Green and Coates Street Passenger Railroad Company, filled with passengers, at Coates and Twenty-Second streets.   The arrest took place at 1 o'clock, P. M., of the day, and shortly after the starting of the car.   He was one of the ordinary drivers of the line, and it is admitted was at the time driving for hire for the company, in the business of carrying passengers, on and along the line of the company's road, for the usual week day fare.   It appears from a letter of the president of the company to the mayor, that it was the intention of the company to run their cars on the day mentioned, and on Sundays generally, under certain regulations, as to the rate of speed in passing churches, and in changing their bells for others making less noise.   The mayor having received this notice, thought it his duty to direct the arrest of those engaged in driving the cars, upon the grounds of a breach of the public peace.

The evidence disclosed that the car was full of passengers, and it was testified that there was considerable noise, and much discussion on the subject of the rumored arrest, and the right of the line to run their cars on Sunday.   It also appeared, that a pretty large concourse of people were collected at the depot of the company, and at the place of the arrest, and that, after the driver and conductor were arrested, there was singing in the car.   Evidence was heard without objection, on both sides, upon the question of the alleged breach of the peace, as to the noise made by those in the car, and of the noise and disturbance made by the car itself.   It appeared that the cars had been run, on and along this line the preceding Sunday, and several witnesses testified that it greatly disturbed the public worship in some of the churches along the line, as well as private citizens.   This evidence was proper, as showing the extent of the disturbance, occasioned by the running on the day of the arrest, and what the extent of it would have been, if continued.   The witnesses for the Commonwealth were generally of the opinion, that the running of the cars was a great disturbance of the peace, and quiet of the Sabbath.   On the other side, it was claimed that the noise made by the cars was only such as was incident to that mode of conveyance, and was not a disturbance to any inconvenient extent, and to this effect they examined several witnesses.

The question for determination now is, whether the prisoner is guilty of a breach of the peace, or only answerable to the penalty inflicted by the Act of 22d April, 1794, for performing worldly employment on the "Lord's day, commonly called Sunday." If the latter, he must be discharged, but if guilty of the former, he must be held to answer in the Quarter Sessions at its next term.

That driving a public conveyance for hire, is doing worldly employment within the provisions of that statute cannot be doubted, since the decision of the court, in the case of the *Commonwealth* v. *Johnson*, 10 Har. 102. It was a similar case—against an omnibus driver, on a line between Pittsburgh and Lawrenceville, and the driving for pay for the owners of the line ; and it was determined by a majority of this court, that this was a violation of the Act of Assembly of 1794. This statute was not the first in Pennsylvania on the subject of Sunday. The statutes of 1705, and 1786, had existed previously thereto, but were in most particulars supplied by the Act of 1794. The provisions of all of them seem to have had in view the same object, the prohibition of worldly business on the Sabbath day, and establishing and maintaining that condition by positive civil enactment as a day of rest and repose. The penalty imposed by the Act of 1794, for a breach of its provisions, is the sum of four dollars, for each and every offence, and in default of payment, imprisonment for six days. If I were determining the liability of this defendant under the evidence, to the penalty of the act, I could not hesitate a moment to say that he had incurred it, but I am not. A different question arising out of this act, is the object of this inquiry ; and that is, whether the defendant, in doing an act prohibited by law, did it in a manner to disturb the public peace ? The existence of the penalty in the act, as a consequence of worldly employment on the Sabbath, is to be taken as a prohibition of the act complained of. 6 Watts, 233 ; Cath. 252. It has been decided, that one penalty covers the combined infractions of a whole day.

It certainly cannot be contended that every violation of that statute is necessarily a breach of the peace. Work noiselessly and quietly done may disturb no one, and still the performer of it, if proceeded against, may have to pay the penalty, but would be answerable no further.

But, when worldly employment is carried on in such a manner, and in such places, as to disturb the peace and quiet, and the religious exercises of a community, either at home or in churches, or places of public worship, and it may not or cannot be restrained by the imposition of the defined penalty in the act, do not such circumstances constitute a breach of the public peace of the Sabbath, and may not the offender or offenders be held

to bail to keep the peace?    That work thus publicly performed, might amount to a breach of the peace, seems to have been the opinion of Chief Justice Tilghman.    In the case of the *Commonwealth* v. *Eyre*, 1 S. & R. 347, he said, " the violation of the Sabbath is a crime which deserves punishment; but when the work done is *without noise or disorder*, there is nothing in it like an actual breach of the peace."    Similar language was held by Chief Justice Yeates in the same case.    The converse of the last portion of the proposition is clearly deducible from the statement of it in the terms used.    In *Dupuy* v. *Commonwealth*, Br. Rep. 41, Kennedy, Justice, sitting at *Nisi Prius*, said, that " doing unnecessary work, so as to *disturb the worship* of others, is indictable.    If arrested, and held to answer for this, the prisoner would be held to good behavior in the meantime."    So in *Teaman* v. *Commonwealth*, 1 Phila. Rep. 460; it was an attempt to hold to bail a new's vendor, for crying and selling his papers on Sunday.    On the hearing, Judge Thompson, of the Court of Common Pleas, said, " The crying of newspapers in the public street on Sunday, *is a breach of the peace*.  As well might the oysterman cry his oysters, or the charcoal man ring his bell.  The peace of Sunday may be disturbed by acts which, on other days, cannot be complained of; such acts as interfere with the rights which the law vouchsafes to the public, who desire to observe that day, as a period of religious observance and rest from worldly business."    The prisoner was discharged, and the reason stated by the learned judge, in the remark that, " if it had appeared that any person complained of being *disturbed by the defendant*, or that any one was accosted by him for the purpose of selling his papers, such complaint would have rendered the defendant liable on the charge now made"—surety of the peace, as I understand the case.

These opinions show, as far as they go, the inclination of the minds of judges, of learning and experience, in regard to this question.    I concur with the doctrine that the law gives to the public the right of enjoying the Sabbath, as a day of rest and of religious exercise, free and clear of all disturbance from merely unnecessary and unauthorized worldly employment. That where this law is contravened in such a manner as to disturb that enjoyment, by noise or disorder accompanying it, or incident to it, it may be treated as a breach of the peace. In this I do not mean the disturbance of conscience—constructive disturbance—but actual; occurring so long, or so frequently, and in such a place, as to amount to a public disturbance.    The reason that the law holds it to be such is, that the occurrence may not be prevented otherwise than by treating it as such, and it is so to be treated to prevent violent remedies to redress the wrong.    If we must wait until breaches of the peace, in the

ordinary and week-day sense of the term, occur, before we may interpose a preventive remedy, then is the mischief done, and the breach of the public peace aggravated.   If the running of cars on passenger railroads is a disturbance of the public peace of the Sabbath, and the rights of worship and of rest, by reason of noise accompanying them, and they are not restrainable, by reason of the inefficiency of existing laws, and must be permitted to continue, because they have not produced actual resistance and collision on the part of, or with those who oppose such a course, this reason will not, in all probability, long be wanting, and we may have the realization of what the unlawful act has a tendency to produce—breaches of the peace, of a more unmistakable character.   It was the duty of the conservators of the public peace to prevent this, if possible.   The history of mankind shows that there is nothing against which they will more zealously and fiercely struggle, than encroachment on the rights of conscience or conscientious exercises. The defendant here acted, in driving the car in question, by direction of his employers, who well knew that they were violating an Act of Assembly; for the law was plain, and the decision on it recent.   They acted in violation of it, not through any principle of necessity, but simply for gain, as the evidence clearly shows, and the prisoner was bound to know the law, and does not deny that he knew the purpose of his employers. His driving the car, at the time of the arrest, was accompanied by noise sufficient, as the testimony shows at the time, and by the experience of the preceeding Sabbath, to greatly interfere with public worship, and disturb the people along the line, and was accompanied by a crowd of persons and some disorderly conduct, if the witnesses are to be believed.   I think this constituted a breach of the peace of the Sabbath, as ordained and established by the act of 1794, and that, under the circumstances, an arrest was proper.

Travelling, or riding for recreation, is not a breach of the Sabbath, and persons may not be arrested for riding along the street for such purposes.   The disturbance, if any, occasioned by the vehicle, would be but for an instant, and not soon recurring. That is very unlike, in character, the carrying of passengers in a vehicle along the same route every six minutes, as was intended by the company on the day the arrest was made.   Nor do I believe in the right to arrest for doing worldly business, unless in cases where the business done does actually disturb the peace of the neighborhood.   Then it amounts to a different offence from that for which the penalty in the Act of 1794 is provided; and this is all that may be necessary to say in answer to the attempted application of the Act of 1806 to the case in hand.   That act provides that when a statute enjoins

anything to be done in a particular way, or affixes a penalty to the doing of an act, the remedy of the statute shall be followed, and no other. The penalty imposed by the Act of 1794, is for the performance of worldly employment—a punishment for the act. The offence complained of here, is the disturbance of the public peace; and the worldly employment, the kind and manner of it, is only evidence of the offence charged. It is not covered by the Act of 1794.

Although Christians, of all denominations, look upon the institution of the Sabbath as of Divine origin, yet it requires statutes to protect its observance; and the Act of 1794, so often referred to, was undoubtedly passed for that purpose. It established what might be called the *peace of the Sabbath.* The public have a right to the benefit of the law. If actually disturbed, they can only be redressed by arresting the disturbers. Compensation for it does not remove the evil. If no arrest can be made for the disturbance incident to, or caused by the worldly pursuits of individuals, then it will follow, that whenever it is more profitable to carry on business by paying the penalty of four dollars, than to abstain from it, there will be found persons in the community ready, publicly, and regardless of the peace of society, to engage in it. In short, four dollars will be a license fee for the right to carry on the most noisy employments, it may be, in the most public places, on the Sabbath, instead of a penalty to secure its observance. If one railroad company may run by paying the penalty, all may run, and all the omnibusses, drays and carts in the city, on the same terms. Where would be the peace and quiet of the Sabbath, in such an event as this? These views do not make the law—they illustrate the reasonableness and propriety of the remedy applied.

This city has for one hundred and fifty years obeyed the law faithfully, in its observance of the Sabbath, and it is not preceptible wherein either its prosperity or character has suffered. If it is likely to do so, those most interested must apply to the law-making power of the Commonwealth, if they wish to exercise privileges at present withheld and prohibited. Railway corporations have accepted their charters under this law, as well as other laws of the land, and should not be the first to grasp at powers not given them in the exercise of these highly profitable and beneficial franchises, bestowed by the liberality of the State. That the prisoner is in custody for doing acts by the instigation of the Passenger Railway Company, for which he was driving, is not denied. He was their servant, *pro hac vice,* and the discussion of his rights was greatly made to depend on the rights of his employers. They were not ignorantly violating the Sabbath laws, in directing the running of their cars. Nor is it insisted that the prisoner was; nor was it insisted that

[Commonwealth *v.* Jeandell.]

the violation was to be but for a solitary trip or a day. It was, rather, to be the inauguration of a new era, resting itself not so much on the laws of our own happy land, as on the examples of "progress," "liberal sentiments," and modification of morals to suit the wants of the age, of other countries, possessing neither our morality, virtue, freedom, nor independence. These considerations were no more reasons operating on my mind, in looking to conclusions, than any extreme sentiments on the other side, which would regard all peaceful recreations on the Sabbath day as violations of God's law, and therefore, necessarily of man's. The conclusion I have come to, is to refuse the discharge of this man. I no further decide upon his case than to refuse his discharge. Let the law hand him over to his proper judges at the proper time. They will decide what is best to be done, when they shall have heard all the testimony in the case. They have ample power to hold him, if he is a disturber of the peace, to give security to keep it, and to be of good behavior, as they shall think right. I am satisfied that the conclusions I have arrived at are sustained by law, and are conducive to the peace and best interests of this community.

I have, so far, taken no notice of the fact, that the prisoner commenced running the car at or about one o'clock, or that he was instructed to move slowly by the churches on the route. The rights of the people to the quiet of the entire day must not be made dependent upon the caution with which it is violated. If it amounts to a disturbance, it is a breach of the peace; and if the public are entitled to an undisturbed portion of the day, they are to the whole of it. Nor was it the right of the prisoner, or of his employers, to assume that people will perform their religious exercises before one o'clock, P. M., or risk disturbance. They are neither to be constrained in the form of worship, time of worship, nor to engage in it at all, by any power, much less a conventional regulation to which they are no parties. Freedom on this point is a guarantee of the Constitution.

Discharge refused and prisoner remanded, but he may now enter into recognizance, with security, to appear at the next court of Quarter Sessions.