# Wheeling.

## THE STATE v. THE B. & O. R. R. CO.

### Decided July 9, 1879.

1. A corporation may be indicted for "Sabbath breaking" under the 16th and 17th sections of chapter 149 of the Code of W. Va.

2. In an indictment against a railroad company for being found laboring at its trade and calling on a certain Sabbath day it is proper and necessary to allege, that such labor was not in household work or other work of necessity or charity; but it is not necessary to allege that the defendant did not conscientiously believe that the seventh day of the week ought to be observed as a Sabbath, or that it did not refrain from all secular labor on that day, or that the labor was not done in the transportation of the mail, or of passengers or their baggage.

3. Such an indictment is not sufficiently sustained by proving that a part of a load of coal was transported over the railroad on the day named in the indictment; but the assent of the corporation to this "Sabbath-breaking" must be shown by proving that such "Sabbath-breaking" was habitual, or by other satisfactory evidence; and such assent can not be inferred from a single breach of the Sabbath by the authorized agents of the company while acting within the scope of their employment.

4. The jury for the trial of such a case should be formed in the manner in which juries in civil suits are formed under our statute.

5. Under what circumstances a court properly refuses to continue a cause.

6. A grand juror, who is witness on the trial of an indictment, can not with a view of showing his prejudice be asked anything which occurred in the grand jury-room.

7. If on the trial of such an indictment the defendant proves that by a general order it had directed its agent and employes not to ship anything except live stock and perishable freight on the Sabbath day, the jury may nevertheless find the defendant guilty, if by proof of the habitual running of freight trains about the time the offense was committed, or from other satisfactory evidence, the jury are satisfied that the running of such trains in violation of such general order met the assent of the corporation.

<em>1879 June Term,</em><br>The State<br>v.<br>B.& O. R R. Co.

9. It is not necessary in such a case to prove by positive affirmative evidence that the cars run over the track of the defendant belonged to, or were under the control of, the defendant; this may be legitimately inferred from their being run over the railroad of the defendant.

10. The Court takes judicial notice that The Baltimore & Ohio Railroad Company is a corporation.

11. It is not necessary, to sustain the indictment, to prove that the acts charged were done on the particular day named in the indictment; it is sufficient to prove that the defendant labored in its trade or calling as alleged in the indictment on a Sabbath day within one year before the finding of the indictment against it, and that such labor was not in household or other work of necessity or charity, unless it appears that the defendant is within one of the exceptions of the 17th section of ch. 149 of the Code of this State.

The circuit court of the county of Mineral on the 3d day of June, 1878, rendered a judgment against The Baltimore and Ohio Railroad Company for Sabbath-breaking.

This is a writ of error, granted on the petition of said company to the judgment of said court then rendered.

Hon. James D. Armstrong, judge of the fourth judicial circuit, rendered the judgment complained of.

GREEN, PRESIDENT, furnishes the following statement of the case:

This was an indictment against The Baltimore & Ohio Railroad Company in the circuit court of Mineral county for laboring at its trade by running over its track in said county cars loaded with coal on Sunday, April 27, 1873. The indictment was as follows:

"FOURTH JUDICIAL CIRCUIT, MINERAL COUNTY, TO-WIT:

"*In the Circuit Court thereof*:

"The grand jurors of the State of West Virginia in and for the body of the county of Mineral, and now attending said court, upon their oaths present and say, that The Baltimore & Ohio Railroad Company, a body corporate and politic, on a Sabbath day, to-wit, on April 27, 1873, in said county, was found laboring at its trade and calling, to-wit, that of common carrier, and did then and there, on the said Sabbath day, labor at its trade and calling, by running over and upon its railroad tracks in said county its engine, the same being a locomotive, and a number of cars, to-wit, ten cars, attached to said engine, the same not being used in household or other work of necessity or charity, or the transportation of the mail or of passengers and their baggage, against the peace and dignity of the State."

This indictment was found May 13, 1873, and endorsed : " A true bill " by the foreman of the grand jury.

On November 17, 1873, the defendant appeared and demurred to this indictment. The case was continued from time to time till May 29, 1878, when the court overruled the demurrer, and the defendant moved the court to continue the case, which motion the court overruled, and thereupon the defendant pleaded not guilty ; and a jury was elected, tried and sworn to well and truly try, and true deliverance make, between the State and the defendant. And they, having heard the evidence and argument of counsel, found the defendant guilty as charged in the indictment, and assessed its fine at $350.00 ; and thereupon the defendant moved the court to correct the judgment and grant it a new trial; and on June 3, 1878, the court overruled the motion and entered up the judgment according to the verdict of the jury. During the trial of the cause the defendant took five bills of exceptions, which were signed, sealed and enrolled by the judge and made parts of the record.

The first bill of exceptions states that the demurrer was argued on May 17, 1878, and the court took time to consider it, and at the same time fixed the 22d day of May for the trial of the case, both parties stating they then expected to be ready for the trial; but the court being occupied with other business on that day this case was not called for trial or the opinion of the court on the demurrer announced; but its opinion was announced on the 29th of May, 1878, the judge stating that the case would be tried the next day. On the next day the defendant, when the case was called for trial, moved the court to continue the case, because it was not ready for trial, it being stated by one of its counsel that the principal counsel of the defendant was absent, and the counsel who was present having expected him to be present had not had time to prepare for the trial of the case and confer with his client. The Commonwealth's attorney stated that he had notified the defendant's counsel several months before that the case would be pressed for trial at that term. And thereupon the court overruled the motion of the defendant for a continuance.

The second bill of exceptions states that the jury was formed in the manner prescribed by law for the formation of juries in civil suits, the State's attorney being allowed to strike four jurors from the list of jurors and the defendant's attorney four, these names being struck alternately by the parties beginning with the State's attorney. The defendant objected to this mode of forming the jury, and to the State's attorney being allowed to strike any juror's name from the list.

The third bill of exceptions states that the foreman of the grand jury testified, that shortly before the May term of the circuit court of Mineral county in 1873, he had seen a train of cars loaded with coal passing along through Keyser in said county on Sunday; that he could not give the number of the locomotive, but that he could give the number of other locomotives which had been lately running on Sunday; that he had observed their numbers that he might get the names of the men running

them to indict them, so as to stop their running trains on Sunday. And thereupon the defendant's attorney asked the witness: "Were you not instrumental at this term in finding indictments against the company?" to which question the State's attorney objected, which objection the court sustained to the extent of refusing to permit the witness to be interrogated as to his action as a grand juror. And the defendant's counsel excepted to this action of the court.

The fifth bill of exceptions states all the facts in the case. They were substantial.y these : After January 1, 1873, and shortly before. the May term of the circuit court of Mineral county, a train of cars loaded with coal was run over the Baltimore & Ohio Railroad, and were observed by several witnesses as it passed eastward through Keyser, the county seat of Mineral county. Among those who so observed this train was the State's attorney, who shortly afterwards drew the indictment in this case ; and he thinks the day he observed this train was the day inserted in the indictment drawn by him. It was on Sunday and was while the persons named as observing it were going to church, or had just come out of church. Another of the parties, who observed this train, was the foreman of the grand jury. who found this indictment. He did not know the number of the engine which carried this train ; .did know the number of a number of other engines which had carried trains running on Sunday recently. He had observed them, because he was told by a lawyer that the hands who ran them could be indicted, though the railroad company could not. He had for a few months past observed the numbers of these engines, that he might find out what hands had run them.

The general agent of The Baltimore and Ohio railroad Company at Piedmont testified, that he had been such general agent from early in April, 1873. He had a standing order, which he received from time to time from the master of transportation of the company, not to ship any freight on Sunday except perishable freight and live

stock; and he knew of no instance in which this order was violated. He had observed it as far as he could; he had never shipped any exclusive coal train on Sunday, and received no coal from the mines on Sunday. They always shipped the coal on Saturday. Sometimes there are some coal hoppers filled which are left over; and if they had perishable freight not enough to make a load which was to be shipped on Sunday, they attached to it these few coal hoppers of coal to make up the load. And sometimes on Sunday they had an order from Cumberland to send down engines on Sunday; and if they had not enough cars in Cumberland to make up a train, empty cars were sent down with these engines sometimes on Sunday. He knew nothing about the train run on April 27, 1873, spoken of by the other witnesses.

On this evidence the court refused to grant the defendant a new trial, and overruled its motion to that effect, and also its motion in arrest of judgment for errors apparent on the face of the record; and the defendant excepted, this being his fifth exception. His fourth bill of exception was as follows :

" Be it remembered, That on the trial of this case, after the evidence on both sides was closed, the facts proven are set forth in exception number five, the defendant asked the court to give the following instructions to the jury, numbered one, two, three, four, five, six, seven, eight :

" No. 1. The court instructs the jury that it is necessary for the State in order to convict the defendant of the offense charged in the indictment to prove affirmatively that the act complained of was not a work of necessity or charity.

" No. 2. The court instructs the jury that in order to convict the defendant of the offense charged in the indictment the State must prove affirmatively that the men in charge of the train which was run over their road, if they believe that any train was run, were employes of, the defendant and acting under its orders at the time.

" No. 3. The court instructs the jury that in order to convict the defendant of the offense charged in the indictment it is necessary for the State to prove affirmatively that the train which was run on a Sabbath day, if they they believe that any was run on Sabbath day, was so run under the direction and authority of the defendant.

" No. 4. The court instructs the jury that even if they believe from the evidence that a train of cars loaded with coal drawn by a locomotive engine, all belonging to or under the control of the defendant, was run eastward under the authority of said defendant over and along its railroad in Mineral county, on a Sabbath day shortly prior to the May term of the circuit court of said county, in 1873, and that the same was under the management and control of employes of the defendant, acting under its orders and authority, and that the running of said train was not a work of necessity or charity, nor for the transportation of the mail, or of passengers and their baggage, still for said acts the defendant cannot be convicted of the offense charged in the indictment.

"No. 5. The court instructs the jury that if they believe from the evidence that the defendant instructed and ordered its agents and employes not to ship anything except live stock and perishable freight on the Sabbath day, and that said order was in force on the 27th day of April, 1878, that then they must acquit the defendant of the offense charged in this indictment, even though they should believe that any of its employes were engaged on a Sabbath day in the transportation of a coal train on its road as alleged in the indictment.

"No 6. The court instructs the jury that it is incumbent on the State to prove beyond a reasonable doubt every fact necessary to convict the defendant of the offense charged by positive affirmative evidence, and the State having offered no evidence in this case to prove that the cars and engine which the witnesses have testified to as running over the railroad track in the town of

Keyser belonged to or were under the control of the defendant, they must find for the defendant.

"No. 7. The court instructs the jury that in the absence of any proof that the defendant is a corporation it cannot be convicted of the offense charged in the indictment.

"No. 8. The court instructs the jury in order to convict the defendant of the offense charged in the indictment it is necessary for the State to prove by direct positive evidence that the acts complained of were done on the 27th day of April, 1873, and that proof of said acts on any other Sabbath day is not sufficient."

The State asked the court to give the following instructions:

" 'The court instructs the jury that if they believe from the evidence that defendant labored at its trade or calling on a Sabbath day within one year before the finding of the indictment against it, and that such labor was not in a work of necessity or charity, nor in the transportation of passengers and their baggage, nor of the mails, then they must find the defendant guilty, though said labor may not have been done on the 27th day of April, 1873.'

"And the court thereupon gave the jury the instructions asked for by the State, and also gave instructions number one, two and three asked for by the defendant, but refused to give instructions numbered four, five, six, seven and eight asked for by the defendant; and thereupon the defendant excepted to the granting of the State's instructions and also to the refusal of the court to grant its instructions numbered four, five, six, seven and eight, and tenders this his fourth bill of exceptions, and prays that the same may be signed, sealed and enrolled as part of this record, which is accordingly done."

To the judgment of the circuit court the defendants have obtained a writ of error and *supersedeas*.

*C. Boggess,* for plaintiff in error, cited the following authorities :

12 Gratt. 663 ; 9 Metc. 562 ; 9 Ad. & E. 326 ; 23 Ind. 362 ; 1 Bish. Crim. L. §422 ; Ang. & Ames Corp. §396 ; 1 Bish. Crim. Pr. §§631–642 ; 53 Ga. 472 ; Acts 1872-3, ch. 42, §§19–27 ; 22 Pa. 102 ; 42 Ind. 311 ; 51 N. H. 446 ; 3 Heisk. 148 ; 54 Pa. St. 401 ; 1 Greenl. Ev. §65 ; 3 Greenl. Ev. §10.

*G. W. Dailey,* for defendant in error, cited the following authorities :

2 Va. Cas. 362, 363 ; Code of W. Va. ch. 158, §26 ; 1 Whart. Crim. L. (5th ed.) §§85, 88 and note to §87 ; Ang. & Ames Corp. 595, 596 ; Redf. on Railways ch. 30 ; 54 Pa. 371 ; 11 Wheat. 392 ; 7 Am. L. Reg. 757 ; 5 Gratt. 682 ; 1 Greenl. Ev. §25 *et seq.;* 19 Gratt. 813–819 ; 2 Gratt. 594 ; 6 Gratt. 712 ; Barton Law Pr. 253.

GREEN, PRESIDENT, delivered the opinion of the Court :

The demurrer to the indictment in this case presents the question : Can a corporation be indicted for a misdemeanor, and if so, what must be the nature of the such misdemeanor ? A clear view of the extent and character of the liability of a corporation in a civil suit for torts must be had before we can determine, whether it can be indicted for a misdemeanor. It was at first doubted whether a corporation was in any case liable in a civil suit for a tort of its agents, and especially whether an action of trespass would lie against a corporation. When these doubts were entertained the business transactions of corporations were very limited ; and the public had but little interest in the question. The public would have suffered but little inconvenience, had the courts held that a corporation was in no case responsible for the torts of its agents. But in modern times a large proportion of business transactions were performed

by corporations; and if they were not responsible for any torts of their agents, the public would obviously be subjected to intolerable inconvenience and wrongs. The courts have accordingly long since solved these doubts in favor of the responsibility of corporations for the torts of their agents, whether these torts are to be redressed by actions of trespass on the case or trespass *vi et armis*. The modern authorities all agree, that corporations are liable for torts committed by their agents in the discharge of the business of their employment and within the proper range of such employment; and that too, whether the tort be one the responsibility for which is to be enforced by an action on the case, or by trespass. See *Yarbrough* v. *The Bank of England,* 16 East. 6; *Rex* v. *The Mayor of Stafford-upon-Avon,* 14 East. 348; *Regina* v. *Birmingham and Gloucester Railway Co,* 3 Ad. &. E. (N. S.) 223; *Maud* v. *Monmouthshire Canal Co,* 4 Man. & G. 452; *Chesnut Hill & Spring House Turnpike Co.,* 4 Serg. & R. 16; *Whiteman* v. *Wilmington & Susquehannah Railroad Co.,* 2 Harr. (Del.) 514; *Bloodgood* v. *Mohawk & Hudson River Railroad Co.,* 14 Wend. 51; *Hay* v. *Cohoes Co.,* 3 Barb. 42; *Underwood* v. *Newport Lyceum,* 5 B. Mon. 130; *Humes* v. *Mayor of Knoxville,* 1 Humph. 403; *Hagan* v. *Boston & Maine R. R. Co.,* 2 Gray 574; *Illinois Central R. R. Co.* v. *Reedy,* 17 Ill. 580; *Baylor* v. *Balt. & Ohio R. R. Co.,* 9 W. Va. 270.

But some courts in modern times have held that a corporation is not liable for the wilful acts of its agents, though done within the proper range of its employment, and that if in the discharge of the business of this employment the servant pursues his own whim or caprice, and acts upon his own impulse, the corporation would not be responsible for such tort but only the servant personally, unless it is proven that the tort was done by the command or with the assent of the corporation. See *Philadelphia, Germantown and Morristown Railroad Co.* v *Witt,* 4 Whart. (Pa.) 143; *Fox* v. *Northern Liberties,* 3 Watts & S. 103; *Illinois Central Railroad Company*

1879
June Term.

The State

v.
B. & O. R. R. Co.

v. *Downey*, 18 Ill. 259. But the reasoning on which these decisions is based, it seems to me; is hardly consistent with the grounds on which other decisions have been based. See *State* v. *Vermont Central Railroad Co.*, 27 Vt. 108; *The South Eastern Railway* v. *The European & American Telegraph Co.*, 24 Eng. L. & Eq. 513; *Queen* v. *Great North of England, Railway* 9 Q. B. 315; *Maud* v. *The Monmouthshire Canal Company*, 4 Man. & G. (43 E. C. L.) 452.

Doubts have been entertained about the proper form of action against a corporation in case of a wilful tort by its agent; but it seems to me the weight of reason is in favor of holding the company responsible in a civil suit, where the tort though wilful has been committed by its agent in the discharge of the business of the corporation without any other proof of the assent of the corporation. it would seem strange to hold, for instance, that a railroad company was responsible for cattle killed carelessly upon its track, but not liable if it was done purposely by the engineer, without proving that it directed it to be done or approved of it being done. It seems to me that in a civil action a corporation should be held virtually to assent to all the acts of its agents and servants done in the regular course of their employment. A corporation really exists and acts only by its agents, and must be held responsible in a civil suit for the acts of the agent done in the discharge of the business of their employment, whether done negligently or on purpose. The true view probably in such case is, that the acts of the agent of a corporation should be regarded as the acts of the agent of a private person when done in the presence of his employer. A corporation is a mere entity inappreciable to the senses, and cannot strictly be said to be either present or absent, when its agent in the transaction of its business commits a tort. Many cases seem to regard it as then absent. But it being a mere fiction whether we regard it as present or absent, it would seem to be more just and reasonable in a civil suit to hold a corporation responsi-

ble for the torts of its agents in such cases as an individual would be responsible for the acts of his agents done in his presence; and when so done an individual may be held responsible for the torts of his agent, though they be wilful and though the principal has been merely passive. See *Morse* v. *The Auburn Railway Co.*, 10 Barb. 621 ; *Vandegrift* v. *Rediker*, 2 Zab. (N. J.) 185.

If a corporation is not thus to be held responsible in all cases of civil suits against it for torts wilfully committed by its authorized agents within the scope of their employment without any evidence of their assent to the tort, this is certainly so in some cases. Thus where a railroad company runs trains before condemning the land, and the trespass by the corporation is only shown by the act of its employes in running the train, yet an action of trespass lies in such case against the corporation without further proof of their assent. See *Haigue* v. *Boston & Maine Railroad*, 2 Gray 574 ; *Edwards* v. *Lawrenceburg & Upper Mississippi Railway*, 7 Porter (Ind.) 711 ; *Hall* v. *Pickering*, 40 Me. 548. These decisions seem to be based on the tacit admission that the corporation was to be regarded as present when its agent committed the trespass, there being no proof other than the act of the agents of the assent of the corporation ; for against an individual trespass will lie for the wilful torts of the servant, *provided* it is done in the presence of the principal. *Chandler* v. *Broughton*, 1 C. & N. (1 Exch. R.) 29. See Redfield on Railways, vol. 1, ch. 20, §2, pp. 510 to 516.

The modern authorities hold corporations responsible for the acts of their agents, though wilfully or maliciously done. Thus a corporation may be responsible for a libel published by its authorized agents. A railway company has been held liable for its agent telegraphing along its line that a banker had stopped payments. See *Whitefield* v. *Southeast Railway Company*, referred to in 21 How. 212. It has also been held liable for a libel in a report made to the stockholders by the directors. See

1879
June Term.

The State
v.
B.& O. R. R. Co.

· Syllabus 1.

*Philadelphia, Wilmington & Baltimore Railroad Company* v. *Quigley*, 21 How. 202. So too a corporation was held liable for a libel in *Manyard* v. *Firemen's Fund Insurance Co.*, 34 Cal. 48 ; so in *National Exchange Company of Glasgow* v. *Drew*, 2 Macqueen House of Lords Cases 103, a corporation was held liable for a fraudulent misrepresentation of its affairs in a report, whereby a party was induced to purchase its stock. And in *Goodspeed* v. *The East Haddam Bank*, 22 Conn. 580, it was held that an action for a malicious prosecution could be sustained against a corporation. In the *Atlantic & Great Western Railway Company* v. *Dunn*, 13 Ohio St. 162, and in *Pittsbury, Fort Wayne & Chicago Railroad Company* v. *John Shiper*, *Id.* 157, it was decided that a corporation might be subjected to exemplary or punitive damages for tortious acts of its agents or servants done within the scope of their authority ; and in *Moore* v. *Fitchburg Railway Company*, 4 Gray 465, that a corporation might be sued for an act of its servant while acting within his authority which amounted to an assault and battery.

We will now consider whether a corporation is in any case liable to indictment. When it was questioned whether a corporation could be sued for any tort, it was also doubted whether it could be in any case indicted. If it was incapable in its corporate capacity of committing a tort, it would seem necessarily to follow that it could in no case be indicted. Lord Holt in an anonymous case, 1 Mod. 559, is reported as saying : "A corporation is not indictable, but the particular members are." It may be now however regarded as settled, not only that a corporation may be sued in tort, but that it may be indicted for a failure to perform certain public duties which the law or its charter imposed upon it. See *Freeholders* v. *Strader*, 3 Harr. 108 ; *Regina* v. *Birmingham and Gloucester Railway Company*, 9 Car. P. 469 ; *Susquehanna & Baltimore Turnpike Company* v. *People*, 15 Wend. 267 ; *Commonwealth* v. *Proprietors of Newburyport Bridge*, 9 Pick. (Mass.) 141. But a distinction was formerly taken be-

tween acts of non-feasance, as a failure to perform certain public duties, and acts of misfeasance by the agents of a corporation. In the one case they have been admitted to be liable to indictment; but in the other they have been held by some courts not to be so liable. Thus in the case of the *Commonwealth* v. *The President, Directors and Company of the Swift Gap Turnpike Company,* 2 Va. Cas. 362, decided in 1823, it was held that a corporation was not indictable for a nuisance for obstructing a highway by digging it up and placing therein large quantities of stone and dirt. The general court in so holding expressed no opinion; but it was probably so held, because the act for which they were indicted was an act of misfeasance by the agents of the corporation for which the court was of opinion that their agents alone could be indicted. And in *State* v. *Great Works Milling and Manufacturing Company,* 20 Maine 41, decided as late as 1841, it was held that a corporation could not be indicted for a nuisance in erecting a dam across a navigable river. Weston, C. J., in delivering the opinion of the court says: "A corporation is created by law for certain beneficial purposes. They can neither commit a crime or misdemeanor, by any positive or affirmative act, or incite others to do so as a corporation. * * * There are cases where *quasi* corporations are indictable for neglect of duties imposed by law. Towns, for instance, chargeable with the maintenance of public highways are by statute indictable for any failure of duty in this respect. The corporation here attempted to be charged has violated no duty imposed upon it by statute. Whatever has been done was by the hand or procurement of individuals. They may be indicted and punished; and the nuisance abated. In our opinion the individuals concerned, and not the corporation, must be held criminally answerable for what has been done."

But these views have in modern times been very generally repudiated; and it is now very generally held that a corporation may be indicted for a nuisance; and though

1879
June Term.

The State
v.
B & O. R. R. Co.
in some cases, in which indictments have been sustained against them, it might be possible perhaps to sustain them, on the ground that in permitting the nuisance which had been erected by their agents they violated a public duty, and thus some of these cases might be regarded as indictments for non-feasance, yet they were not based on such a view, but were placed on the broad ground that corporations are indictable not merely for non-feasance of duty but for misfeasance of their agents; and the distinction between non-feasance and misfeasance by their agents is distinctly repudiated. Thus in the case of *Regina* v. *Great North of England Railway Co.* 9 Ad. & E. (N. S.) 319, decided in 1846, it was held that a railroad company might be indicted for cuttting through and obstructing a public highway. Lord Denman, C. J., in delivering the opinion of the court says:

" The question is whether an indictment will lie at common law against a corporation for a *misfeasance*, it being admitted in conformity with undisputed decisions that an indictment may be maintained against a corporation for *non-feasance*. All preliminary difficulties, as to the serving of process, the mode of appearing and pleading, and enforcing judgment, are by this admission swept away. But the argument is, that for a wrong act a corporation is not amenable to an indictment, though for a wrong omission it undoubtedly is, assuming, in the first place, that there is a plain and obvious distinction between the two species of offense     *     * but if the distinction were easily discoverable, why should a corporation be liable for the one species of offense and not the other? The startling incongruity of allowing the exemption is one strong argument against it. The law is often entangled in technical embarassments; but there is none here. It is as easy to charge a person or a body corporate with erecting a bar across a public road as with the non-repair of it; and they may as well be compelled to pay a fine for the act as for the omission.

" Some dicta occur in old cases that 'a corporation can not be guilty of treason or felony' and it might be added 'of perjury or offences against the person.' The court of common pleas lately held that a corporation might be sued in trespass. *Maud* v. *The Monmouthshire Canal Co.* 4 Man. & G. 452 ; but nobody has sought to fix them with acts of immorality. These plainly derive their character from the corrupted mind of the person committing them and are violations of the social duties belonging to men and subjects. A corporation, which as such has no such duties, can not be guilty in these cases ; but they may be guilty of commanding acts to be done to the nuisance of the community at large. The late case of *Regina* v. *Birmingham & Gloucester Railway Company*, 3 Q. B. 223, was confined to the state of things then before the court, which amounted to a non-feasance only ; but was by no means intended to deny the liability of a corporation for misfeasance.

" We are told that this remedy is not required because the individuals who concur in voting the order, or in executing the work, may be made answerable for it by criminal proceedings. Of this there is no doubt ; but the public knows nothing of the former ; and the latter, it they can be identified, are commonly persons of the lowest rank, wholly incompetent to make any reparation for the injury. There can be no effectual means of deterring from an oppressive exercise of power for the purpose of gain, except the remedy by an indictment against those who truly commit it, that is, the corporation acting by its majority ; and there is no principle which places them beyond the reach of the law for such proceedings."

I have quoted this opinion at length, because it lays down clearly principles which have been generally adopted in this country. Thus in *The State* v. *The Morris & Essex Railroad Co.*, 3 Zabriskie (23 N. J.) 360, an indictment was sustained against a railroad company for

erecting a depot on a public highway.  Chief Justice Green, delivering the opinion of the court, says :

"But it is said, that although a corporation may omit to perform acts made obligatory upon it by law, and thus be liable for *non-feasance*, yet from its very nature it cannot use force, and therefore cannot commit any act involving force, and which must be charged to have been committed *vi et armis*.  This argument rests entirely upon the disability of a corporation to commit any act of trespass or positive wrong, and applies to its capacity to commit *civil* as well as *criminal* injuries.  It is the very argument by which it was sought to be established that no action for a trespass or *tort* would lie against a corporation.  But it has been well said, that if a corporation has itself no hands with which to strike, it may employ the hands of others; and it is now perfectly well settled contrary to the ancient authorities, that a corporation is liable *civiliter*, for all torts committed by its servants by authority of the corporation, express or implied.  Thus it is liable in trover or in case for indirect injuries resulting from tortious acts, in trespass *quare clausum fregit*, or trespass *vi et armis* to personal property, and in ejectment.  So a corporation may be guilty of a *disseisin*, or even of an assault and false imprisonment."

These positions are sustained by numerous authorities cited, and the Chief Justice says of them : "These cases have all arisen within the present century and are certainly in conflict with the ancient doctrine."  He then proceeds thus :

"It is further objected that a corporation aggregate cannot be liable to indictment for any crime because the commission of the criminal act is not warranted by their corporate powers.  This argument pushed to its legitimate conclusion, would exempt a corporation from all liability for wrongs *civil* as well as criminal.  It is true there are crimes (perjury, for example) of which a corporation cannot in the nature of things be guilty.  There are other crimes, as treason and murder, for which the

punishment imposed by law ▓▓▓▓ be inflicted upon a corporation. Nor can they ▓▓▓ for any crime of which a corrupt intent or *m*▓▓▓*imus* is an essential ingredient. But the erection of mere nuisance involves no such element. It is totally immaterial whether the person erecting the nuisance does it ignorantly or by design, with a good intent or evil intent, and there is no reason why for such an offense a corporation should not be indicted."

For a like offense an indictment against a railroad company was sustained in *State* v. *Vermont Central Railroad Co.*, 27 Vt. 107. In the *Commonwealth* v. *Proprietors of New Bedford Bridge Co.*, 2 Gray 339, an indictment was sustained against a corporation for a nuisance in the erection of a bridge across a navigable stream. Bigelow, J., in this case says, p. 345: "Corporations cannot be indicted for offences which derive their criminality from evil intention, or which consist in a violation of those social duties which appertain to men and subjects. They cannot be guilty of treason or felony, or perjury or offences against the person ; but beyond this there is no good reason for their exemption."

These, and other decisions which might be cited, establish on satisfactory reason the liability of corporations to indictment for misfeasance done by them by their servants and agents in certain classes of cases. The real difficulty is in defining the cases in which corporations are liable to indictment for misfeasance. I have quoted the language of several judges who have attempted to define the cases in which a corporation may be indicted ; but their definitions do not seem to me to be entirely satisfactory. They seem to me to limit too much the liability of a corporation to indictment for misdemeanors. Thus Chief Justice Green says : "Nor can they be liable for any offense of which a corrupt intent or *malus animus* is an essential ingredient;" and Bigelow, J. says: "Corporations cannot be indicted for offenses which derive their criminality from evil intention."

In view of the fac⬛⬛⬛ce these decisions have been rendered, the court⬛⬛⬛shown a tendency to extend the liability of cor⬛⬛⬛s in civil actions for the misfeasance of their agents, and as it seems now well settled that they may be held liable in suits for libel, and perhaps malicious prosecution, and for assaults and batteries committed by their agents in the performance of their duties, and in view of the further fact that they may in such suits, it is said, be subjected to exemplary or prunitive damages, I hesitate to accede to the statement that they cannot be held liable to an indictment for any offenses which derive their criminality from evil intention. The very basis of an action of libel, or for a malicious prosecution, is the evil intent, the malice of the party against whom such a suit is brought; and I cannot now well see how it is possible to hold that a corporation may be sued for a libel, and prunitive damages recovered, and at the same time hold that such corporation could not be indicted for such libel. The suits of libel and malicious prosecution are in their nature very like to criminal proceedings; and if they lie against a corporation, it would seem to follow, that there are cases for which indictments may lie against a corporation where the evil intention constitutes an element in the offense. And if a corporation is as has been said liable civilly for an assault and battery committed through its servants, it is perhaps going too far to say that a corporation can in no case be liable criminally for any offenses against the person under any circumstances.

But it is unnecessary for us in this case to define accurately in what cases a corporation can be indicted. The boundaries laid down by all the judges whose language I have quoted, though perhaps not sufficiently extended, are all of them sufficiently extensive to include the liability of a corporation to be indicted for the statutory misdemeanor of " Sabbath breaking," as defined by our statute law. If this be so, it is all that it is necessary or proper for us to determine in this case.

This misdemeanor, "Sabbath breaking," is created by the 16th and 17th sections of ch. 149 of our Code, pages 694 and 695, which are:

"Sec. 16. If a person on a Sabbath day be found laboring at any trade or calling, or employ his minor children, apprentices, or servants in labor, or other business, except in household or other work of necessity or charity he shall be fined not less than $5.00 for each offense. And every day any such minor, child or servant or apprentice is so employed shall constitute a distinct offense. Any person found hunting or shooting on the Sabbath day, or openly carrying firearms on that day, to the annoyance of the public shall be guilty of a misdemernor and fined not less than $5.00 or more than $20.00. But this provision as to carrying firearms and shooting shall not apply to an officer or person lawfully carrying such arms, or shooting on the Sabbath day, under any law of the State or of the United States.

"Sec. 17. No forfeiture shall be incurred under the preceeding section for the transportation on Sunday of the mail, or of passengers or their baggage. And the said forfeiture shall not be incurred by any person who conscientiously believes, that the seventh day of the week ought to be observed as a Sabbath, and actually refrains from all secular business on that day, provided he does not compel an apprentice or servant not of his belief to do secular work or business on Sunday, or does not on that day disturb any other person. And no contract shall be deemed void because it is made on the Sabbath day."

It is argued, that this statute requires this observance of the Sabbath day as a religious duty imposed upon us by God, and that as corporations can owe no religious duty the statute can not be construed to extend to them. In this argument it is assumed as universally admitted, that God has imposed on all mankind the duty of keeping the first day of the week as holy. This assumption is far from being conceded. It is of course not admitted by those of our citizens who are dis-

believers in the christian religion. Nor is it true, that it is admitted by all believers in christianity.

Judge Read in his opinion in *Sparhawk* v. *The Union Passenger Railway Co.*, 54 Pa. St. 434 to 439, discusses this question at length and endeavors to show that christianity does not enjoin the keeping of the Sabbath as a holy day. To establish this position he cites many texts from the bible and among them Col., ch. 2, v. 14, 15; Gal., ch. 4, v. 9, 10, and Romans, ch. 14, v. 5. He quotes, too, largely from the writings of many recognized christian divines and theologians as sustaining his view, among them Calvin, Luther, Rev. Dr. Rice, Barclay's Apology, Jeremy Taylor, Bishop White, and Rev. Dr. James W. Alexander; and he asserts that the leading protestant reformers, Melancthon, Beza, Bucer, Zuinglius, Knox, and Cranmer all believed, that the observance of the Sabbath day as holy was not a requirement of the christian religion ; and he says that with them concurred Milton, Paley, Arnold of Rugby and Penn the founder of Pennsylvania.

But I conceive this theological controversy is utterly unimportant in construing our statute. It might well be admitted, that it was the universally received opinion of all persons in this country that the christian religion required, as a religious duty, the observance of the Sabbath day and yet be easy to show, from the very wording of our statute, that our Legislature has not attempted to enforce the fulfilment of this christian duty by any person. Had the Legislature really imposed on the community an obligation to support this observance of the Sabbath as a tenet of religion, they would in so doing have violated Article II. section 9 of the then Constitution, and Article III. section 15 of our present Constitution, which forbids the Legislature to compel any one to support any religious worship, or to confer any peculiar advantage on any sect. The requiring of those who, for instance, believed that Saturday was a holy day to observe Sunday as such, while

those who believed that Sunday was a holy day were not required to observe Saturday as such, would have been conferring peculiar advantages on one sect and would have violated our Constitution.

The Supreme Court of California, interpreting their statute in reference to the observance of the Sabbath as enforcing on the community this observance as a religious duty, pronounced the law unconstitutional and void, *Ex parte Newman,* 9 Cal. 502. But it has been elsewhere very generally held that statutes more or less resembling ours were constitutional, because they did not enforce the observance of the Sabbath as a religious duty. See *Specht* v. *Commonwealth,* 8 Burr. 312 ; *Shower* v. *State,* 5 Eng. (Ark.) 259 ; *Voglesong* v. *State,* 9 Ind. 112 ; *The State* v. *Ambs,* 20 Mo. 214.

In construing our statute it would be our duty to give to it a meaning consistent with our constitution, if its meaning was doubtful, and such meaning could reasonably be attached to its language. Its meaning is not however doubtful. It was obviously not intended by our statute to enforce the observance of the Sabbath as a religious duty. The Legislature obviously regarded it as promotive of the mental, moral and physical well-being of men, that they should .rest from their labors at stated intervals ; and in this all experience shows they were right. If then rest is to be enjoined as a matter of public policy at stated intervals, it is obvious that public convenience would be much promoted by the community generally resting on the same day ; for otherwise each individual would be much annoyed and hindered in finding that those, with whom he had business to transact, were resting on the day on which he was working. The Legislature holding these views in selecting the particular day of rest doubtless selected Sunday, because it was deemed a proper day of rest by a majority of our people who thought it a religious duty to rest on that day ; and in selecting this day for these reasons the Legislature acted wisely. The law requires that the day be observ-

ed as a day of rest, not because it is a religious duty, but because such observance promotes the physical, mental and moral well-being of the community ; and Sunday is selected as this day of rest, because if any other day had been named, it would have imposed unnecessarily onerous obligations on the community, inasmuch as many of them would have rested on Sunday as a religious duty, and the requirement of another to be observed as a day of rest would have resulted in two days being observed instead of one, and thus time would have been uselessly wasted. This I conceive is the main object of our law ; but it is not its only object. While I am thus resting on the Sabbath in obedience to law, it is right and reasonable that my rest should not be disturbed by others. Such a disturbance by others of my rest is in its nature a nuisance, which the law ought to punish, and Sabbath breaking has been frequently classed with nuisances and punished as such. See *Commonwealth* v. *Jeandell,* 2 Grant (Pa.) 506. That these are the objects of our statute are to my mind clearly shown by the wording of the law and by its provisions.

The 17th section of the act, see Code, p. 695, provides that the forfeiture imposed by the 16th section "shall not be incurred by any person who conscientiously believes that the seventh day of the week ought to be observed as a Sabbath, and actually refrains from all secular labor on that day, provided he does not compel an apprentice or servant not of his belief to do secular work or business on Sunday, or does not on that day disturb any other person." This in effect says : The resting on Sunday is not required of any one on the ground that it is a religious duty, but because the well-being of men require that they should rest one-seventh part of their time and public convenience requires this rest should be taken on the day when a majority of the community would even without law on the subject rest, as they regard it a religious duty to do so, and it would be prejudicial to the public and tend to idleness, if two-sevenths of time was

devoted to rest. If then any portion of the community should regard it as their religious duty to rest on some other day than Sunday, and do so rest, they are not required to rest on Sunday, as one-seventh of time is all that the public good requires to be devoted to rest. But if you do not rest on Sunday, you must take care not to disturb those who do, and not to compel others to work who should rest on that day.

The obvious purpose of the law was not to enforce the performance of a religious or moral duty; for it expressly provides that this supposed religious duty may be neglected by any one, who will rest the required seventh part of his time. It may be said however that the 16th section in prohibiting hunting or shooting on Sunday shows that the true and real spirit of the law is to enforce the keeping of the Sabbath holy as a religious duty. But it must be obvious that this section does not prohibit hunting or shooting on Sunday, it only prohibits it from being done in a way which shall be "to the annoyance of the public." That is your hunting and shooting must not be so done as to make it a public nuisance; and this is in full accord with the general purpose of the act as I have explained it. No inference can be drawn from the act forbidding a person "to employ his minor children, apprentices or servants in labor" that the purpose of the act was to enforce on parents the social duty of training religiously their children, as has been suggested in argument. The spirit of this clause is simply to forbid masters from compelling their servants to labor more than six-sevenths of their time; and minor children are named simply because minor children are the servants of their parents. Nor can any inference be drawn that the whole scope of this law has not been correctly stated, because it is placed in the chapter headed "Offenses against morality and decency." There are other sections in this chapter punishing offenses or acts which can not be regarded as *mala in se*, or as contrary to religion or ab-

stract morality; as the intermarriage of a white person with a negro. If these be correct views of the true meaning and purpose of this act, it is obvious that there is no reason why its observance should not be enforced against corporations, and why they should not be fined according to the provisions of this act for employing their servants in labor. The punishment inflicted is not because they in employing their servants in labor on Sunday, are violating the fourth commandment or committing any immoral act, but because they are requiring their servants to labor more than six-sevenths of their time; and this is regarded by the State as prejudicial to their well-being. The corporation is therefore punished not for the violation of any social or moral obligation, but simply because it is violating a positive law forbidding it to employ its servants in labor on Sunday; or because it is annoying others who are thus resting in obedience to law.

Syllabus 3. The next enquiry is as to the character of the proof necessary to sustain an indictment against a corporation for a misfeasance of its authorized agent. There is respectable authority, as we have seen, which holds that in a civil suit against a corporation for a tort *wilfully* done by its authorized agent within the scope of his employment, it is necessary to prove the approval of the act by the corporation; and that such approval is not established by simply proving that it was done by an authorized agent acting within the general scope of his employment. See 3 Serg. & R. 103. But this independent proof of authority is not, as we have seen, always necessary to be proven; and I incline to the opinion, as I have before stated, that it is never necessary in a civil suit. But be this as it may, it would seem quite clear that this independent proof of the approval by the corporation of the act is necessary in some cases, when the proceeding against the corporation is a criminal proceeding. It is certainly true that in some cases of indictment against corporations for a misfeasance no such independent proof is

1879
June Term.

The State
v.
B. & O. R. R. Co.

necessary. But the simple proof that the criminal act was done by agents of the corporation within the scope of their employment is sufficient to sustain the indictment. It so happens that all the reported cases of such indictments, which I have seen, are of this character. In none of them was anything more required than simply to prove that the servants of the corporation had done the criminal act while acting for the corporation within the scope of their employment. But in all these cases the criminal act for which the indictment was found, was obviously an act which from its nature must have been approved by the corporation; such as the erection of a depot in a public road, the building of a bridge across a navigable stream in such manner as to interfere with navigation. In such cases no proof of the approval of the corporation was necessary, except the simple proof that it was done by its agents.

But while in a civil suit for a tort, even when done wilfully, perhaps no other proof may be necessary in any case, yet to hold such proof sufficient to sustain an indictment against a corporation for the misfeasance of its agents in every case would be to disregard the maxim, that the accused is always presumed to be innocent; and clear proof of guilt on the part of the accused must be produced, before a conviction can properly be had. The act of misfeasance may, in a particular case, be of such a character, that though done by an authorized agent within the scope of his general employment and for the benefit of the corporation, yet it may give rise to but a suspicion that it has been directed or approved by the corporation. And if the act be of such character, independent proof must in such case be produced of the approval of the corporation, before it can be found guilty in a criminal proceeding. In such case it would clearly not be necessary to prove that the corporation by a distinct act, such as a vote of its directors, either directed the act to be done or subsequently approved of its being done. For if this was required, it would amount to an absolute

exemption of a corporation from all liability criminally
for the wrongs of its agents; for criminal acts are never
so formally directed or approved. Still in such a case
the approval of the corporation must be satisfactorily
proven. But such approval may be shown satisfactorily
otherwise than by proving such direct act of approval.
The criminal act being in such a case done by an author-
ized agent acting within the scope of his authority, the
mere doing of the act, even though done wilfully, suf-
ficiently shows, we incline to think, the assent and ap-
proval of the corporation, to make them liable in a civil
suit; and it gives rise to a suspicion in a criminal pro-
ceeding against the corporation, which, if corroborated
by evidence that similar acts have been done by the
agents of the corporation repeatedly, would be sufficient
proof of their approval to justify a conviction. It is
but a reasonable inference that acts which are habitually
done by the authorized agents of a corporation are done
with their approval; and this is indeed almost the only
manner in which the approval by the corporation of the
acts of its agents can ever be proven. The tacit appro-
priation by a corporation of the benefits of the acts of its
agents, repeatedly occurring, is full and satisfactory proof
of the assent of the corporation to the doing of such
acts.

There is but little difficulty in applying the law we
have laid down to the present case. The court below
properly decided that the defendant, though a corpora-
tion, could be indicted for Sabbath-breaking under the
16th and 17th sections of ch. 149 of our Code, pp. 694,
695. Upon common law principles a corporation is in-
dictable for a misdemeanor, unless the character of the
misdemeanor be such as in its nature could not be com-
mitted by a corporation; and this misdemeanor is not of
such a character. It is true the 16th section of this
chapter imposes a fine on *a person* only who breaks the
Sabbath; but ch. 13, §15, subdivision 9, Code of W. Va.,
p. 93, provides, that in construing a statute the word

Syllabus 1.

"person" shall include a corporation, if not restricted by its context. This statute is not so restricted, but on the contrary the statute seems to have had corporations, and especially railroad companies, in view, as under the 17th section "the transportation on Sunday of the mail and of passengers and their baggage" is permitted.

But while the defendant, a corporation was liable to indictment found in this case, yet the court below erred in not granting it a new trial, the evidence in this case being clearly insufficient to sustain the finding of the jury that the defendant was guilty. The evidence proved that on April 27, 1873, that being Sunday, there were shipped in Mineral county over the Baltimore and Ohio railroad by the authorized general agent of the company, who had a general supervision of freight trains, some ten or fifteen hoppers filled with coal, that being about half the number of cars usually carried by an engine ; that this general superintendent had a standing order not to ship any freight on Sunday except perishable freight and live stock. Their was no evidence to show that this order was not, at or about the time this coal was shipped, habitually obeyed, or that, at or about that time, any freight had been shipped over the road on Sunday except upon the single occasion when these ten or fifteen hoppers of coal were shipped. There was some evidence tending to prove that five years after that time freight was frequently shipped over the road on Sunday. This evidence is entirely insufficient to prove that these ten or fifteen hoppers of coal were shipped on Sunday with the assent of the Baltimore and Ohio Railroad Company. The act of shipping ten to fifteen hoppers of coal on a particular day is a very different thing from building a bridge over a navigable stream. It is a perfectly just inference, indeed a conclusive inference, from the mere building of such bridge that the corporation to which it belonged approved thereof; and no other proof of their approval, except the simple proof that it was their bridge, was necessary. But the ten to fifteen

1879
June Term.

The State
v.
B.& O. R. R. Co.

hoppers of coal might well have been shipped in viola-
tion of the orders of the company and without their as-
sent or approval.   It may well be that on a single oc-
casion, in 1873, the superintendent of freight shipped this
half load of coal on Sunday, because of some failure to
ship it on Saturday when it ought regularly to have been
shipped; and if done upon but one single occasion, the
inference that it was approved by the company is a vio-
lent inference, which the jury had no right to draw.
Had it been proven that in 1873 frieght trains of coal
were habitually shipped on Sunday over the road, the
the jury would have been fully justified in drawing this
inference, as the company is legally presumed to be in-
formed as to the acts of its agents; and if these acts con-
tinue to be done, they must be presumed to be approved ;
and proof that orders had been issued forbidding such acts
to be done ought not to prevent the inference that they
were done with the approval of the company.   For if
done contrary to their wishes, the inference is inevitable
that they would have caused them to be discontinued.
But there is no proof that in 1873 freight was habitually
carried over the road on Sunday, or that it was done in
1873 at all except on this single occasion.   Had the proof
been satisfactory that freight was habitually carried over
the road on Sunday in 1878, this could furnish very
slight evidence, if any, that the company approved this
act done five years before.   The policy of the company
in this respect may well have changed in five years.

A new trial should therefore have been granted to the
defendant.

The indictment is not defective in failing to state that
the defendant did not conscientiously believe the seventh
day of the week ought to be observed as a Sabbath &c.
The rule is, "that where exceptions are in the enacting
part of a law, it must in the indictment be charged that
the defendant is not in any of them ; but what comes in
by way of proviso in a statute must be insisted on for the
purposes of defense by the party accused," See *Hill's Case,*

*Syllabus 7.*

*Syllabus 2.*

1879
June Term.

The State
v.
B.& O. R. R. Co.

5 Gratt. 682. This provision contained in the 17th section is in the nature of a proviso ; it is not an exception in the enacting part of the law ; and it was therefore unnecessary to notice it in the indictment, even if the indictment had been against a natural person. As a corporation cannot have conscientious beliefs in reference to religious questions, the proviso has no application to this case; and had it been even inserted in the enacting clause in the 16th section, it would not have been proper to have noticed it in this indictment.

It is clear that the court did not err in refusing to continue the case upon the facts stated in the first exception.

The oath administered to the jury was certainly not in proper form. Whether that could be taken advantage of after verdict we need not enquire. It was a clerical blunder which we may safely assume will not be again committed.

There was no error in the manner of forming the jury. It was done in the usual mode. The defendant and the plaintiff were each allowed to challenge four jurors peremptorily by striking them from the list. This was done under the provisions of section 23 of ch. 47 of Acts of 1872-3. See page 108. And this act applies to the trial of cases of misdemeanor as well as civil suits. A different mode is provided only in felony cases, and when in the discretion. of the court a special jury is allowed under the 27th section of the act. *Syllabus 4.*

The court did not err in refusing to permit Carskadon to be interrogated as to his action as a grand juror with a view of showing his prejudice. A grand juror can not for any purpose be interrogated as to his action as a grand juror. *Syllabus 6.*

The court did not err in refusing to give the fourth, fifth, sixth, seventh and eighth instructions asked by the defendant. In addition to the points as to which an opinion has already been expressed by me these instructions state, that in the absence of proof that the de-.

fendant is a corporation it cannot be convicted, nor in the absence of proof that the cars which were drawn over the track on Sunday belonged to the defendant or were under its control, or in the absence of positive proof that the offense was committed on the 27th day of April, 1873, the day named in the indictment. None of these instructions asked laid down the law correctly. The charter of The Baltimore & Ohio Railroad Co., whereby it is made a corporation, is a public act of which the court takes judicial notice. *Hart* v. *Baltimore & Ohio Railroad Co.*, 6 W. Va. 336. The jury had a right to infer that the cars run over the track of the defendant belonged to them and were under their control. The exact time laid in the indictment as the time when the offense was committed is not necessary to be proven. The indictment is satisfied by proof of the offense on any day anterior to the finding and within the time, if any, within which the law prescribes that, the offense must be prosecuted, unless when the time enters into the nature of the offense. This is an elementary principle which needs no authority to sustain. The time here enters into the nature of the offense only so far as that the acts done to constitute the offense must be done on Sunday; and therefore the indictment was bound to allege that such acts were done on Sunday; and the proof was bound to show that the acts were done on Sunday. See *State* v. *Land*, 42 Ind. 311. · But it was unnecessary to prove that the acts were done on the particular Sunday mentioned in the indictment, provided they were done on Sunday, and within the time prescribed for the prosecution of such offense. The instruction asked for by the State was therefore properly given. It is argued that this instruction should have said: "that if the defendant was found laboring at its trade or calling as a common carrier," instead of "at its trade or calling generally." It would have been more definite, if the instruction had been worded so in this respect as to have corresponded with the indictment; but

1879
June Term.
———
The State
v.
B.& O. R. R. Co.
Syllabus 9.

Syllabus 10.

Syllabus 11.

with all the evidence certified to us we cannot see that this instruction as given tended to mislead the jury, or that the court erred in giving it in the form in which it was given.

1879
June Term.

The State
v.
B.&O. R. R. Co.

The judgment of the circuit court rendered June 3, 1878, refusing to grant a new trial and adjudging that the defendant pay to the State the sum of $350.00, the fine assessed by the jury, and the costs of the prosecution, must be set aside, reversed and annulled; and this court proceeding to render such judgment, as the court below ought to have done, doth set aside the verdict of the jury and doth award a new trial to the defendant; and this cause is remanded to the circuit court of Mineral county, to be there proceeded with according to the principles laid down in this opinion, and further according to law.

THE OTHER JUDGES CONCURRED.

JUDGMENT REVERSED. CAUSE REMANDED.