# WHEELING.

24 783
52 260

## STATE *v.* RAILROAD COMPANY.

Submitted September 11, 1883—Decided May 3, 1884.

1. Sections 16 and 17 of chapter 149 of the Code of West Virginia, which provide for fining any person who labors in his calling on the Sabbath day or employs his servants in so doing except in works of necessity or charity, and providing, that there shall be excepted from the operation of this law the transportation on Sunday of the mail or of passengers and their baggage, when applied to a railroad company transporting coal or freight through this State or from this State to Maryland on Sunday, is not to be regarded as an act, which regulates commerce among the several States, though it may incidentally have an effect on such inter-State-commerce. It must be regarded as purely a law in reference to the internal policy of this State; and therefore it does not violate clause 3 of section 8 of article I. of the Constitution of the United States, which confers on Congress the power to regulate commerce among the several States. Such law may therefore be enforced against a railroad company engaged in such inter-State-commerce. (p. 787.)

2. On the trial of an indictment under this act against such a railroad company. the court below did not err in refusing to permit the following question to be propounded by the defendant to a dispatcher of trains of the defendant: "Did the defendant run out any train from Piedmont east in the month of April, 1873, or about that time except such as were necessary?" (p. 798.)

GREEN, JUDGE, furnishes the following statement of the case.

This is an indictment found by the grand jury of Mineral county against the Baltimore and Ohio Railroad Company for laboring in its trade and calling of common carrier on a Sabbath day to-wit, on May 27, 1873, in said county by running over its tracks its engine and cars, the same not being used in household work or other work of necessity or charity. The case was tried at the May term, 1878, and the jury found the defendant guilty and assessed its fine at three hundred and eighty dollars, and the circuit court in pursuance of said verdict entered a judgment in favor of the State for that amount. The case was then taken by writ of error to this Court and on July 9, 1879, this Court reversed the judgment

and remanded the case for a new trial, because the verdict of the jury was not sustained by the evidence, (15 W. Va. 562). The case was again tried by a jury, the trial commencing on May 18, 1880, and on May 20, 1880, the jury found the defendant guilty and assessed its fine at one hundred dollars. A new trial was asked and refused, and judgment was rendered for the State of West Virginia against the defendant on May 22, 1880, for this one hundred dollars and her costs. During the trial several bills of exceptions were taken by the defendant, and in one of them all the evidence given at the trial is set forth.

The State proved by two witnesses, that on April 22, 1873, which was Sunday, they saw a train of fifteen or twenty cars loaded exclusively with coal pass on the defendant's railroad going eastward; and it proved by four witnesses, that for many years prior to this time railroad cars loaded with merchandise and sometimes with coal alone and often with some coal cars in the train passed over the Baltimore and Ohio railroad track on almost every Sunday. They were through trains, going eastward. The road leaves Mineral county and passes into Maryland about one and one half miles eastward of Keyser, and Piedmont in Mineral county was the end of one of the divisions of this railroad. The witnesses did not know where these cars came from or where they were going to; they were apparently through trains bound for Baltimore; none of them stopped at Keyser on Sunday.

The defendant proved by its employes, that its orders were to ship all coal trains from Piedmont on Saturday, and they had no recollection of ever violating these orders. At the same time these employes testified, that if all the freight trains that came into the Piedmont yards on the evening and night, were stopped there over Sunday, it would blockade the yard so that passenger trains could not run, and there would be great delay and confusion in starting them on Monday. The yard at Piedmont would not hold all the trains that came in on Saturday night. They testified, that not many trains were run on Sundays. Trains carrying livestock and perishable freight were run on Sunday; but cars carrying either local freight or passengers were not run on Sunday. They stated that perhaps a coal train coming in a convoy

from the west might have been shipped on Sunday. The following question was propounded to a dispatcher of trains from Piedmont: "Did the defendant run out any train from Piedmont east in the month of April, 1873, or about that time, except such as were necessary?" This question was objected to by the State, and the court sustained the objection "on the ground that the question was leading and also that it was not for the witness to decide what was necessary, but the facts, on which the defendant relied to show the necessity, should be proven before the jury for it to decide whether necessary or not." To this action of the court the defendant excepted.

The defendant asked of the court these two instructions:

Defendant's instruction No. 1: "The burden is upon the State to prove to the satisfaction of the jury, not only that the said locomotive and train of cars were run on Sunday, but that there was no necessity for so running them; and if the jury are not able to find from the proof whether there was such necessity or not, they must find the defendant not guilty."

Defendant's instruction No. 2: "The burden of proof is upon the State to show that the said locomotive and train of cars were run on Sunday, and that it was not necessary to run them on that day; and in the absence of any proof showing the purpose for which they were so run, or as to when and where they were started from, or where they were destined to go, they cannot infer any one of those facts from the mere running, or that their movement on that day was not an act of necessity or charity."

The court refused to give such instruction and in lieu thereof gave the following instruction:

"The court instructs the jury that the burden of proof is on the State to satisfy the jury that the locomotive and train of cars were not run as a work of necessity or charity, but in determining that question, the jury may take into consideration the nature of the work done, the character of the freight carried, the circumstances under which the locomotive and train were run, and all the evidence before them."

And thereupon the State asked the court to give the following instruction to the jury, viz.:

"The court instructs the jury that if they believe from the evidence, beyond a reasonable doubt, that the Baltimore and Ohio Railroad Company was found laboring at its trade or calling, that of a common carrier, within Mineral county, on a Sabbath day, within one year before the finding of the indictment against it, and that such labor was not in a work of necessity or charity, nor in the transportation of the mails nor of passengers and their baggage, then they must find the defendant guilty, although they may further believe that such labor was not on the 27th day of April, 1873."

The defendant objected to this instruction but the objection was overruled, and the court gave the instruction asked for by the State. To the action and ruling of the court in giving the said instruction asked for by the State, and in refusing to give the said instructions Nos. 1 and 2 asked for by the defendant and giving said instruction in lieu thereof, the defendant objected; and this constitutes its second bill of exceptions. The defendant also asked the following instructions:

(5.) "If the jury find from the evidence that the defendant was, at the time stated in the indictment, running the said locomotive and cars by steam in transporting coal and other merchantable commodity from the State of West Virginia into the State of Maryland, it was not for this cause liable to the penalty prescribed by the laws of the State of West Virginia for Sabbath breaking or for running the said locomotive and cars on a Sunday, and they must find the defendant not guilty."

(6.) "The court is asked to instruct the jury that so far as the State of West Virginia prohibits the defendant from operating its road on a Sunday in the transportation of coal or merchandise from the State of West Virginia into the State of Maryland, it is in contravention of the laws of the United States in relation to commerce between States, and void."

To the giving of which instructions, or either of them, the attorney for the State objected, because neither of them correctly stated the law, and the court sustained said objection, and refused to give the said instructions, or either of them. To this ruling and judgment of the court the defendant excepted, which was his third bill of exceptions.

To the judgment of the court rendered on May 2, 1880, the defendant obtained a writ of error.

*C. Boggess* for plaintiff in error.

*Attorney-General Watts* for the State.

GREEN, JUDGE:

The principal question in this case is: Are sections 16 and 17 of chapter 149 of the Code of West Virginia in contravention of section 8, article I. of the Constitution of the United States (see Code W. Va. p. 8 and sec. 5,258 of Rev. Stat. of United States, title 64, p. 1,017 of 2d edition passed in pursuance of this provision of the Constitution,) in so far as it interferes with the transportation of coal or merchandise by a railroad company from the State of West Virginia into Maryland on a Sabbath day, when it is shown that such transportation is neither a work of necessity or charity, but is simply a following of its regular business on the Sabbath day as on other days? This question is raised by the fifth and sixth instructions offered by the defendant below set out in bill of exceptions No. 3. The court below decided that this law of West Virginia was not in contravention of the Constitution of the United States or of this act of Congress, when so applied to a railroad company so transporting coal or merchandise on the Sabbath day. This decision was excepted to by the defendant in bill of exceptions No. 3. The counsel for the defendant below has argued elaborately this question, and after considering certain decisions of the Supreme Court of the United States he draws from them these five conclusions:

"1. *Transportation* is commerce.

"2. *Transportation* from one State to another is commerce 'between the States.'

"3. If *transportation* is begun in one State to be completed or ended in another, whether by the same instrument or carrier, it is commerce 'between the States.'

"4. Commerce 'between the States' is necessarily national in its character and *exclusively* under the control of Congress.

"5. Non-action by Congress in regulating it, is equivalent to a declaration that it shall remain *free* and *untrammeled*."

These propositions except the fifth are all sustained by the decisions of the Supreme Court of the United States, when applied to the transportation of merchandise or coal, which is as far as the counsel for the defendant below has in this case any occasion to contend that they are true. If not sustained fully by the decisions referred to by the counsel for the defendant below, they are abundantly sustained by other decisions of the Supreme Court and ought to be regarded as incontrovertable. But if applied to the transportation of persons, they have been controverted and regarded as not true by jurists of eminent ability and by judges of the Supreme Court of the highest capacity. But we have no occasion to consider, whether these propositions or any of them are true when applied to the transportation of persons, as this is entirely foreign to anything in the case, the transportation of coal or merchandise on the Sabbath day being alone involved in this case; and the statute law of W. Va. section 17 of chapter 149 of Code of W. Va. page 695, expressly excepts from the operation of the law even in considering "the transportation on Sunday of the mail or of passengers and their baggage."

The fifth proposition of the counsel for the defendant below in the broad sense laid down by the counsel is not sustained by the decisions of the Supreme Court of the United States, though individual judges have used language so broad and unqualified that such an inference might be drawn. But the decision really made in the cases, in which such broad and unqualified language was used, do not sustain the proposition that "non-action by Congress in regulating commerce between the States in any particular matter is equivalent to a declaration that it should remain *free* and *untrammeled.* And therefore that any regulation of *any sort* in such a case by State Legislature is null and void." There can be no doubt, that, though Congress has failed to regulate commerce between the States, certain kinds of legislation by the States regulating such commerce would be null and void. But it is equally clear that certain regulation of such commerce might in the absence of legislation by Congress on the subject be enacted by State Legislatures, which unquestionably would not be unconstitutional by contraven-

ing article I., section 8 sub-division 3 of the Constitution of the United States, which gives to Congress the power "to regulate commerce among the several States.".

The law is thus laid down by the Supreme Court of the United States in *Gilmore* v. *Philadelphia*, 3 Wall. 713: "The power to regulate commerce between the States covers a wide field and embraces a great variety of subjects some of which will call for uniform rules and national legislation, while others can be best regulated by rules and provisions suggested by the varying circumstances of differing places and limited in their operation to such places respectively. And to the extent required by these last cases, the power to regulate commerce between the States may be exercised by the States, so far as such legislation is not in conflict with some act of Congress passed either before or after such State legislation regulating commerce in this particular case and manner." This was decided by the Court and was not the dictum of some judge. It is true it was decided by a divided court. The decision was rendered as late as December, 1865, and merely followed a decision rendered in December, 1851, in which seven judges concurred and but two dissented (*Cooley* v. *Board of Wardens of Port of Philadelphia et al.*, 12 How. 299). These decisions again met the approval of the Supreme Court of the United States in *Crandall* v. *Nevada*, 6 Wall. 35, decided in December, 1867. The same doctrine was recognized again in *Walton* v. *State of Missouri*, 91 U. S. 275, and in *Henderson* v. *Mayor of New York*, 92 U. S. 259, and in other cases. The last to which I will refer, is the *County of Mobile* v. *Kimball*, 102 U. S. (12 Otto.) 691. This case was decided as late as October, 1880, and was concurred in by all the judges.

The dissenting views of individual judges on which the counsel bases his proposition No. 5 above quoted is referred to; and Judge Field in delivering the opinion of the entire court on page 699 says: "There have been it is true expressions by individual judges of this court going to the length that the mere grant of the commercial power, anterior to any action of Congress under it, is exclusive of all State authority; but there has been no adjudication of this court to that effect." He then reviews the various decisions of

the court on this subject and reaches the conclusion, page 702, that "whether the power to regulate commerce between the States is vested exclusively in the general government depends upon the nature of the subject to be regulated." And he adds: "This may be considered as expressing the final judgment of this court." This fifth proposition of the counsel is true only in a qualified sense; and the support of it referred to by the counsel in his argument are these ill-advised and condemned views of individual judges.

I have considered the extent to which this fifth proposition or inference of counsel is true, in order that there may be no misconception of our views.

To sustain his propositions one counsel cites the following authorities: *Welton* v. *Missouri*, 1 Otto 275; *Lord* v. *Steam-ship Co.*, 12 Otto 544; *Mobile* v. *Kimball*, 12 Otto p. 702; *Railroad Co.* v. *Husen*, 50 U. S. 465; *Hall* v. *De Adm'r*, 5 Otto 485; *Henderson et al.* v. *Mayor of New York*, 2 Otto 259; *Case of Daniel Ball*, 10 Wall. 557; *Pensocola Tel. Co.* v. *W. Union Tel. Co.* 6 Otto 1. From these cases large quotations are made, but an examination of them all will show, that with the exception of some loose language of individual judges or the opinions of individual judges not in consonance with the views of the court, there is nothing decided in any of these cases inconsistent with the views which I have expressed. And they render necessary some qualification of the five propositions of law deduced from . them. But if they really sustained these five propositions in their broadest and most comprehensive sense, they would in no manner affect in any degree the conclusion to which I must come on the question we are considering. Admit, as is ·certainly true, that the transportation of coal or merchandise from West Virginia to Baltimore or from any point through West Virginia to Baltimore is commerce between the States, and that the regulation of this commerce belongs exclusively to the Congress of the United States under article I. section 8, clause 3 of the Constitution of the United States, and that the non-action of Congress in *regulating* it, is equivalent to a declaration, that it shall remain *free* and *untrammeled*, thus forbids the Legislature of the State to pass any laws *regulating* it in any matter or to any degree, still all this in no man-

ner tends to show, much less does it as assumed in the argument of counsel prove sections 16 and 17 of chapter 149 of our Code is void because in contravention of said Constitution of the United States. That clause, so far as it relates to this case is as follows: "The Congress shall have power to *regulate* commerce among the several States." The act of our Legislature supposed to be in conflict with this provision of the Constitution of the United States is, so far as it relates to this case, as follows: "If a person on a Sabbath day be found laboring at any trade or calling or employ his servants in labor or other business except in household or other work of necessity or charity, he shall be fined not less than five dollars for such offence." This act does not conflict with the provision of the Constitution of the United States above quoted, for the simple reason that the State act in no manner undertakes to regulate commerce between the States, even allowing that the Constitution of the United States confers in all possible cases and under all circumstances the exclusive *regulation* of commerce between the States on the Congress of the United States.

When this case was formerly before this Court we held, that "it was obviously not intended by this act of our Legislature to enforce the observance of the Sabbath as a religious duty. The Legislature obviously regarded it as promotive of the mental, moral, and physical well being of men that they should rest from their labors at stated intervals; and in this all experience shows they were right." 15 W. Va. 383. The Court said further: "It has been very generally held, that statutes more or less resembling ours were constitutional, because they did not enforce the observance of the Sabbath as a religious duty." We concluded for this reason, that our statute was not a violation of our State Constitution and that it applied equally to individuals and to corporations. It never occurred to us to consider, whether our statute violated that provision of the United States Constitution which gives to Congress the exclusive regulation of commerce between the States. And such an idea was not in any way suggested then by the counsel of the Baltimore and Ohio Railroad Company, though the case was argued elaborately and amply by him. This of itself would seem to indicate,

that it was a far fetched idea, that our statute was a regulation of commerce between the States. But though it was not seen, when formerly before this Court, it is now insisted that it is clearly a statute regulating commerce between the States, if it be applied as it then was, to the Baltimore and Ohio Railroad Company. This position is taken because counsel assumes, that as one of the consequential effects of this statute, if applied to railroads, would be to diminish the transportation of freight on the Baltimore and Ohio railroad, as no freight would be transported on this railroad on Sunday unless the transportation of it was a work of necessity or charity. Unquestionably this statute will have the effect of diminishing the transportation of freight over the Baltimore and Ohio railroad on the Sabbath day; but it is well settled, "that everything which affects commerce is not simply for that reason a regulation of it within the meaning of the Constitution of the United States." This has been repeatedly decided by the Supreme Court of the United States. Thus in the case known as the *State Tax on Railway Gross Receipts* or *Reading Railway Company* v. *Pennsylvania,* 15 Wall. 284, it was held: "A statute imposing a tax upon the gross receipts of railroad companies is not repugnant to the Constitution of the United States, and it is not a regulation of commerce between the States." Justice Strong delivering the opinion of the court says:

"No doubt any tax upon business affects the subjects and operations of commerce, yet it is not everything which affects commerce that amounts to a regulation of it within the meaning of the Constitution (p. 293);    *    *    *    *    That its ultimate effect may be to increase the cost of transportation may be admitted. So it must be admitted that a tax on any article of personal property, that may become a subject of commerce, or upon any instrument of commerce, affects commerce itself. If the tax be upon the instrument as a railroad car, its tendency is to increase the cost of transportation. Still it is not a tax upon transportation or upon commerce, and it has never been seriously doubted that such a tax may be laid (p. 294).    *    *    *    *    While it must be conceded that a tax upon inter-State transportation is invalid, there seems to be no stronger reason for denying

the power of a State to tax the fruits of such transportation after they had been mingled with the general property of the carrier (the railroad company), than there is for denying the State power to tax goods which have been imported after their original packages had been broken, and after they have been mixed with the mass of personal property in the country (p. 295)."

Upon these principles the right of the State of West Virginia to tax the gross receipts of the Baltimore and Ohio Railroad Company for transportation in this State is clear, yet the greater part of those receipts is derived from the transportation of through freight products from the Western States to Baltimore and from Baltimore either to this State or through this State to Western States. This taxation of course increases the charges made by the railroad on the goods transported from other States to or through this State. It operates indirectly as a charge on the goods transported from one State to another, yet it is no regulation of commerce. But a tax directly on the goods transported from other States to this State or transported through this State would be a regulation of commerce between the States, and if made by this State, would be a violation of the Constitution of the United States. For the real and prime object of the framers of the United States Constitution in giving to Congress the exclusive control of commerce between the States was to prevent the several States from burdening the citizens of other States by laying unreasonable and unjust burdens on their goods coming into the State for sale or merely passing through the State. But the tax on the cars of the railroad or on the gross amount of their receipts produces no such ill effects, and is in fact an exercise of the *police power* of the State, which it never surrendered, and which it may exercise, though it may incidentally affect the commerce between the States. It is a misnomer to call the exercise of such *police power*, because it may or does affect inter-State-commerce, a *regulation* of commerce between the States.

So in *Mann v. Illinois*, 94 U. S. R. p. 40, it was held, when a warehouse is situated within a State, the State may as a matter of domestic concern prescribe regulations for it, not-

withstanding it is used as an instrument by those engaged in inter-State-commerce as well as in State-commerce. And though in this case the law may in its character be a regulation of commerce, until Congress acts in reference to the inter-State relations of such warehouse, such regulations can be enforced, even though they may indirectly operate on commerce beyond the jurisdiction of the State.

The *Slaughter-house Cause*, 16 Wall. 36, is another instance where a law obviously affecting inter-State-commerce was held valid as a police regulation for the comfort of the people.

In *The City of New York* v. *Muhn*, 11 Pet. 102, a law of New York was held not in contravention of this provision of the Constitution of the United States, which provides, that " every master of every vessel arriving in New York from a part of any other State is required under prescribed penalties within one day after his arrival to report in writing the names, ages and last legal settlement of every passenger." This act was decided not to be a regulation of inter-State-commerce, but a police act, which the State had a right to pass as a means to prevent her being burdened with paupers. The court says, page 139 : " We plant ourselves on what we consider impregnable positions. They are these : A State has the same undeniable and unlimited jurisdiction over all persons and things, within its territorial limits, when the jurisdiction is not surrendered or restrained by the Constitution of the United States. That, by virtue of this, it is not only the right but the bounden and solemn duty of the State to advance the safety, happiness and prosperity of its people, and to provide for their general welfare, by any and every act of legislation, which it may deem conducive to these ends, when the power over the particular subject or the manner of its exercise is not surrendered or restrained, in the manner just stated. That all those powers which relate to mere municipal legislation, or what may, perhaps, more properly be called *internal police powers* are not thus surrendered or restrained ; and consequently in relation to these, the authority of a State is complete, unqualified and exclusive. If we were to attempt a definition of this *internal police* we should say every law came within this description which concerns the welfare of the whole people of the State or of any individual

within it; whether it related to their rights or their duties; whether it respected them as men or as citizens of the State; whether in their public or private relations: whether it related to the rights of persons or of property, of the whole people of the State or of any individual within it; and whose operation was within the territorial limits of the State and upon persons and things within its jdrisdiction." Surely the law of this State fining one, who employs his' servants in laboring on Sunday comes within this definition of "an internal police law," which any State has a right to pass, though it does affect inter-State-commerce the regulation of which belongs exclusively to Congress.

To show what is regarded by the Supreme Court of the United States as now organized as this *police power* of the State, which it has never surrendered, I will refer to the opinion of Justice Strong in the case of the *Railroad Company* v. *Husen*, 95 U. S. R. (5 Otto), decided October 1877. He says: "We admit that the deposit in Congress of the power to regulate foreign commerce and commerce among the States was not a surrender of that which may probably be denominated police power. What that power is it is difficult to define with sharp precision. It is generally said to extend to making regulations promotive of domestic order, morals, health and safety. As was said in *Thorp* v. *The Rutland & Burlington Railroad Co.*, 27 Vt. 149, it extends to the protection of lives, limbs, health, comfort and quiet of all persons, and the protection of all property within the State. According to the maxim *sic uteri tuo et alienum non lœdas*, which being of universal application, it must of course be within the range of legislative action to define the mode and manner in which every one may so use his own as not to injure others. It was further said that by the general police power of a State, a person's own property was subjected to all kind of restraints and burdens, in order to secure the general comfort, health and prosperity of the State; of the perfect right of the Legislature to do which, no question ever was, or upon acknowledged general principles ever can be made so far as natural persons are concerned. It may be also admitted that the police power of a State justifies the production of precautionary measures against social evils.

Under it a State may legislate to prevent the spread of crime, pauperism or disturbance of the peace.  It may exclude from its limits convicts, paupers, idiots and lunatics, and persons likely to become a public charge, as well as persons afflicted by contagious or infectious diseases." (p. 470–71)  *   *   * "Neither the unlimited power of a State to tax, nor any of its large police powers, can be exercised to such extent as to work a practical assumption of the powers properly conferred upon Congress by the Constitution.  Many acts of a State may indeed, affect commerce, without amounting to a regulation of it, in the constitutional sense of the term. And it is sometimes difficult to define the distinction between that which merely affects or influences and that which regulates or furnishes a rule of conduct."

In that particular case a law of Missouri prohibited the driving or conveying any Texan, Mexican or Indian cattle into the State of Missouri between the first day of March and the first day of November in each year, and it seems to me to have been very properly held to be unconstitutional. Such a law did not come within the police power of the State, as it has been above defined and illustrated.  It was not intended to promote the mental, moral and physical well being of the people of Missouri, but it was a discrimination in inter-State commerce to the prejudice of the people of another State, and it was precisely for the prevention of such wrongs that the clause was inserted in the Constitution of the United States conferring upon Congress the exclusive regulation of inter-State commerce.  See *Railroad Co.* v. *Richmond*, 19 Wall. 589, where Judge Fields says correctly: "The power to regulate commerce among the several States was vested in Congress in order to secure equality and freedom in commercial intercourse against discriminating State legislation."   This Missouri statute was obviously intended to make just such discrimination as this constitutional provision was intended to prevent.  It was clearly unconstitutional.

But how utterly different is the law of this State which we are considering.  It was obviously as we said, when the case was formerly before us, passed for the sole purpose of promoting the mental, moral and physical well being of our

people by providing that they should rest a seventh part of their time from labor of every description, and that this rest should be at regular intervals.   The Legislature had no sort of purpose in so doing to regulate in any way inter-State commerce.   It does not, as the Missouri statute did, propose to trammel, hinder or shackle commerce.   It lays no tax on such merchandise coming into or going out of the State, as some unconstitutional laws have done.   It was, it seems to me, obviously a mere police law intended simply to promote the welfare of the people of the State, and it does not operate to discriminate as against any class of persons non-residents of the State or citizens of other States.   It was intended for and was only an internal police law, and though it may have some incidental effect upon the inter-State commerce carried on by the Baltimore and Ohio Railroad Company, that fact according to all the authorities does not make such a law unconstitutional as regulating inter-State commerce; for it does not regulate it in the constitutional sense of this word.   Many more authorities might be cited, which would strengthen the views above taken, but it is deemed unnecessary, as while the authorities show that there has been some times difficulty in determining, whether an act of the Legislature was a regulation of inter-State commerce or an internal police law, yet these cases show that where such difficulty arose it was because of an inherent difficulty in determining what was the real object of the Legislature in the passage of the act; in the case before us it is obvious that the entire object of the act was to promote the mental, moral and physical well being of persons in this State, and though it might incidentally affect the transportation of merchandise on Sunday over the Baltimore and Ohio railroad, yet in no case, which I have seen, would this incidental effect convert what was clearly a law simply of internal police into a law regulating inter-State commerce. No doubt there have been persons, who would so construe this clause of the Constitution giving to Congress the right to regulate inter-State commerce, that with a like strained interpretation of other general provisions in the United States Constitution it would confer on Congress almost unlimited power of legislation and thus change essentially the character of

our government, and take by implication from the States to a great extent the power to legislate with reference to their internal affairs; but, I think, none have yet gone so far as to deny to the State Legislature the power to pass such a law as we are discussing. If the spirit had always prevailed of giving no strained construction to the Constitution of the United States, but only such construction as it fairly bore having reference to the evils intended to be corrected by the Constitution, I cannot but think that great and crying evils, the legitimate result of this mode of construing the Constitution, would have been avoided.

In the present case the evil to be corrected by the giving to Congress the power to regulate inter-State and foreign commerce was in the language of Justice Field in *Railroad Co.* v. *Richmond*, 19 Wall. 584, "to secure equality and freedom in commercial intercourse against discriminating State legislation." The inference to be drawn from these words of Justice Field's is, that no State legislation, which does not discriminate in favor of its own citizens or of others against the citizens of other States, and which leaves inter-State commerce free and equal ought to be construed as violating the spirit of this provision of the Constitution. If the trade of all the States be permitted to be carried on with equality and freedom, all that was intended by this provision of the Constitution is accomplished, and there is no propriety in forcing a construction on this provision of the Constitution so as to harass and trammel the States in legislation with reference to their internal affairs, though many laws of this character passed by them would necessarily affect inter-State commerce, but not so as to produce the inequality and discrimination intended to be avoided by this provision of the Constitution. For these reasons I am of opinion that the circuit court committed no error in refusing to grant instructions 5 and 6 set out in the third bill of exceptions.

The court did right in not permitting the defendant below to ask of its dispatcher of trains from Piedmont the question: "Did the defendant run out any trains from Piedmont east in the month of April, 1873, or about that time, except such as were necessary?" The inquiry, which the jury had been sworn to try, was "whether the defendant

run out any trains about that time except when they were run out as a work of necessity or charity." Now it is very obvious from the testimony in the case, that the counsel for the defendant took the position that if more trains accumulated at Piedmont on Sunday than could be accommodated on the tracks, which the railroad had there, then the running out of trains from there was a work of necessity. This position was clearly answered, for it was the duty of the railroad to have tracks enough at Piedmont or where its trains stopped to enable it to run its trains in the manner required by law, that is, so as not to employ its servants in running such trains on Sunday. But propounded as this question was, the dispatcher of trains was called upon to solve the law-question, what trains it was *necessary* to dispatch from Piedmont. If he dispatched any trains from Piedmont, he should have said so, and the question asked should have been under what circumstances they were dispatched, and it was for the jury under the instructions of the court to determine, whether their dispatch on Sunday was necessary. By this question the witness was asked to perform this duty of the jury, not even furnishing them the means of knowing what his ideas of necessity were. Such evidence could have have been of no possible use in eliciting the truth; and, as an answer to it would have only tended to mislead and deceive the jury, the court properly refused to permit it to be put.

The circuit court also properly refused to grant the defendant's instructions Nos. 1 and 2 set out in the second bill of exceptions, and in lieu of them properly gave the instructions, "that the burden of proof is on the State to satisfy the jury, that the locomotive and train of cars were not run as a work of necessity or charity." In this respect it corresponds substantially with the two instructions asked by the defendant. And that it was right is shown by the opinion of this Court in this case found in 15 W. Va. 390, and second point of the syllabus of 362. The defendant asks the court to add, that "if the jury was not able to find from the proof whether there was such necessity or not, they must find the defendant not guilty." In lieu of that the court instructed the jury, that "in determining this question, the

jury must take into consideration the nature of the work done, the character of the freight carried, the circumstances under which the locomotive and train were run and all the evidence before them." Now it seems to me the defendant's instruction was calculated to mislead the jury, as by it they might well have supposed they were only to look to the positive proof in the case bearing directly on this point. To prevent this misleading the court properly changed the instruction so as to inform the jury, that in reaching their conclusion as to whether the running of a train on Sunday was necessary, they should look not only to the positive evidence on the point but also to the circumstantial evidence, which evidence was strong to show that the running of the train on Sunday was neither a work of necessity nor of charity. The latter part of the second instruction of the defendant it would have been improper for the court to give, as it would have been an unwarrantable interference by the court with the province of the jury. This part of the instruction was in the following words: "In the absence of any purpose for which said trains were run or as to when and where they were started from or where they were destined to go they cannot infer any of these facts from their mere running, or that their movement on that day was not an act of necessity or charity." It would be improper for the court in any case to tell a jury what facts they could or could not infer from other facts proven nor could the court properly tell the jury, whether they could or could not draw an inference that the work was not a work of necessity or charity from certain facts. These inferences were all matters, which the jury alone unaided by the court should draw; they were inferences of fact and the court can not properly undertake to tell a jury what weight they should give to any legitimate fact proven to them. They should give to it such weight, as men of common sense would deem it entitled to, and draw from any facts such inference of other facts, as they as men of common sense think ought to be drawn. (State v. Thompson, 21 W. Va. p. 741.) The court in the instruction it gave properly avoided this blunder, leaving the jury to draw its own inference and merely telling them they would in doing so consider the circumstantial as well as the

positive proof. From what was said by this Court, when this case was formerly before the Court, and from the general statement of the evidence we have given, it is obvious, that if the jury believed the evidence of the State and did not put confidence in the evidence of the defendant, they were justified in rendering the verdict which they did render; for from the evidence they might justly infer, that the defendant was aware that freight trains were, at and about the time that the indictment charged that the offence was committed, frequently run on Sunday, and that this had been habitually done for years, and this being the case, they had a right to infer, that this running of coal trains on Sunday was done with the approbation of the defendant. (15 W. Va. 3d point of syll. 388.)

The evidence of the defendant's witness tending to show, that these trains were not run by the authority of the defendant is of course on well settled principles to be considered of little or no value on a motion for a new trial. We have failed to take notice of the only instruction given at the instance of the State. It was full and perfect and in accord with the opinion of this Court in this case in 15 W. Va. 362 and 392; and it was so full and perfect, as to prevent any misapprehension, which the jury might possibly have labored under because of the instruction given by the court to the jury being less full than it should have been, though it laid down the law correctly.

I am therefore of opinion, that the judgment of the circuit court of Mineral of May 22, 1880, must be approved and affirmed; and the defendant in error must recover of the plaintiff in error his costs in this Court expended and damages according to law.

AFFIRMED.